IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LINDA NELLIE FISHER, ) | 8:11CV78 |
| ) | |
| Plaintiff, ) | |
| ) | MEMORANDUM |
| v. ) | AND ORDER |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |
| ) | |

    Plaintiff, Linda Nellie Fisher, brings this suit challenging the Social Security Commissioner's final administrative decision denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

### I. BACKGROUND

    Plaintiff filed her application for benefits on February 2, 2008 (Tr. 171-73).[2] Her claim was denied initially (Tr. 115, 137-40) and on reconsideration (Tr. 117, 142-45). On January 5, 2010, following a hearing at which Plaintiff was represented by counsel, an administrative law judge ("ALJ") issued an unfavorable decision (Tr. 124-32). On December 22, 2010, the Appeals Council of the Social Security

---

[1] Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's final administrative decisions under Title II.

[2] The transcript ("Tr.") or administrative record was electronically filed by the Commissioner and docketed as filing 19.

Administration denied Plaintiff's request for review (Tr. 48-52); as a result, the ALJ's decision stands as the final decision of the Commissioner. This action followed.

### A. *The ALJ's Findings*

The ALJ evaluated Plaintiff's claim according to the 5-step sequential analysis prescribed by the Social Security Regulations, *see* 20 C.F.R. § 404.1520(a)(4),[3] and made these findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since January 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: obesity, diabetes mellitus, migraine headaches, and arthritis (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments

---

[3] "At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ('RFC')] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity as defined in 20 CFR 404.1567(a) to lift and carry 10 pounds occasionally and frequently; sit or stand at will; and with occasional stooping, crouching, crawling, and kneeling.[4]

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant . . . was 47 years old, which is deemed as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

---

[4] A claimant's RFC represents the most she can do despite the combined effect of her credible limitations. *See* 20 C.F.R. §§ 404.1545. The ALJ is responsible for assessing a claimant's RFC based on all the relevant evidence, including the claimant's description of his limitations, the medical records, and observations of the claimant's physicians and others. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).

>   11. The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2008 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 126-131)

### B. *Statement of Issues*

Plaintiff argues that the ALJ failed to make a proper RFC assessment because he (1) summarily rejected Plaintiff's testimony and (2) did not request her treating physician to provide an opinion as to Plaintiff's residual functional capacity.

### C. *Statement of Facts*

Plaintiff claimed in her application for benefits that she became disabled on January 15, 2008 (Tr. 171). In her disability report, Plaintiff alleged disability due to fibromyalgia,[5] diabetes, scleroderma,[6] and Raynaud's disease[7] (Tr. 222). Plaintiff's

---

[5] Fibromyalgia is a common syndrome in which a person has long-term, body-wide pain and tenderness in the joints, muscles, tendons, and other soft tissues. Fibromyalgia has also been linked to fatigue, sleep problems, headaches, depression, and anxiety. *See* United States National Library of Medicine, PubMed Health website at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001463.

[6] Scleroderma is a connective tissue disease that involves changes in the skin, blood vessels, muscles, and internal organs. It is a type of autoimmune disorder, a condition that occurs when the immune system mistakenly attacks and destroys healthy body tissue. *See* United States National Library of Medicine, PubMed Health website at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001465.

[7] Raynaud's disease is a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose. *See* United States National Library of Medicine, PubMed Health website at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001449.

medical evidence includes records dating from September 1996 through July 2009 (Tr. 281-547).

In August 2006, Kent Blakely, M.D., examined Plaintiff for her complaints of pain (Tr. 531-34). He noted that he diagnosed Plaintiff with fibromyalgia during her last appointment four or five years earlier (Tr. 531). Plaintiff reported working full-time as a certified nurse's assistant (Tr. 531). Upon examination, Plaintiff had a steady gait and normal pulses, strength, sensation, and range of motion (Tr. 532-33). She had tenderness in her shoulder, hip, and knees (Tr. 532). She had 16 of 18 tender points present for fibromyalgia (Tr. 533). Her mental status examination was normal (Tr. 533). Dr. Blakely assessed morbid obesity, depression, type-2 diabetes mellitus, and fibromyalgia (Tr. 533). He prescribed medication and instructed Plaintiff to return in six months (Tr. 533-34). He also told Plaintiff that she needed to exercise regularly (Tr. 534).

In February 2007, Plaintiff told Lorinda Reece, M.D., her treating physician, that she was "thinking about trying to get permanent disability" for her fibromyalgia (Tr. 329). Plaintiff indicated she was dissatisfied with Dr. Blakely and was interested in finding another rheumatologist. Plaintiff reported working 5 to 7 days per week and experienced pain while working (Tr. 329). She also complained of numbness in her hands (Tr. 329). Plaintiff's physical examination was normal except for some tenderness in the epigastric area (Tr. 329). Dr. Reece assessed hypercholesteralemia, fibromyalgia, polymenorrhea, and type-2 diabetes (Tr. 329). Dr. Reece advised Plaintiff "that she would need to see a different physician besides myself to qualify for the disability" (Tr. 329).

Plaintiff returned to her doctor's office a few weeks later with complaints of vertigo related to a cold virus (Tr. 416). Terry Gourley, PA-C, told her to take over-the-counter Sudafed (Tr. 408). In April 2007, Plaintiff saw Mr. Gourley for an upper respiratory infection (Tr. 321, 331)  Plaintiff also saw Dr. Reece in April

-5-

2007 to have her medications refilled (Tr. 281). Plaintiff was assessed with diarrhea, fibromyalgia, type-2 diabetes, and hypothyroidism (Tr. 281).

In August 2007, Plaintiff complained to Dr. Reece of acute neck pain that began the day before (Tr. 453). She also complained of low back pain that began three days earlier (Tr. 453). Her physical examination was unremarkable; she had normal muscle strength and tone, no motor and sensory changes, and no remarkable neurological findings (Tr. 454). The assessment was acute lymphadenitis and lumbago with radiation to posterior thighs bilaterally (Tr. 454). Dr. Reece told Plaintiff to stretch and to take over-the-counter pain relievers as needed (Tr. 454).

Plaintiff hurt her thigh and back putting up Christmas lights at the end of November 2007 (Tr. 408). She had point tenderness in three different places, but Mr. Gourley noted that there was no abrasion or contusion and that Plaintiff could walk on her own power (Tr. 408).

One week later, Plaintiff complained to Mr. Gourley of cough and congestion (Tr. 407). She also told him that she was trying to get disability for fibromyalgia and had been having more pain since her fall the week before (Tr. 407). Her physical examination revealed an upper respiratory infection (Tr. 407). Mr. Gourley and Plaintiff talked about Plaintiff's recurring pain and Mr. Gourley suggested she get assistance to help with medical bills (Tr. 407). In January and February 2008, Mr. Gourley prescribed medication for Plaintiff's upper respiratory infection and laryngitis (Tr. 406, 418).

In March 2008, after Plaintiff had applied for Social Security disability insurance benefits, Leland Lamberty, M.D., performed a physical consultative examination (Tr. 419-23). Plaintiff told Dr. Lamberty that she had been diagnosed with several autoimmune disorders about 10 to 15 years earlier (Tr. 419). Her other health problems included hypothyroidism, migraine headaches, hypertension, GERD, non-insulin-dependent diabetes mellitus, and obstructive sleep apnea (Tr. 419). Her

-6-

weight was 252 pounds and her blood pressure was 128/84 (Tr. 420). Dr. Lamberty observed that Plaintiff appeared to be in discomfort, especially when she changed positions (Tr. 421). He noted that she moved very slowly during the examination (Tr. 421). Her vision was 20/30 in her right eye and 20/25 in her left eye with glasses (Tr. 421). She had minimal tenderness over the mid-spine, but significant tenderness in multiple areas of her back (Tr. 422). She had good range of motion in her arms and legs and her pedal pulses were excellent (Tr. 422). She had no motor or sensory deficits (Tr. 422). Dr. Lamberty concluded that Plaintiff "genuinely seems to be in pain most of the time" (Tr. 422). He stated that Plaintiff would not be able to do moderate or strenuous work and that lifting and significant twisting or squatting would be very difficult for her (Tr. 422). He opined that more sedentary type work would appear to be within her grasp, provided that she frequently changed positions and continued on her medications (Tr. 423).

Also in March 2008, Rebecca Schroeder, Ph.D., performed a psychological consultative examination of Plaintiff (Tr. 538-46). Testing indicated that Plaintiff had average scores in auditory, visual, and memory function, except a just-below average score in working memory (Tr. 543). Dr. Schroeder noted that Plaintiff appeared to struggle most on tasks requiring focus and concentration (Tr. 543). Overall, her memory function appeared to be good (Tr. 544). Plaintiff's mental status examination revealed that she was well-oriented, alert, and well-spoken, with well-developed communication skills, a good mood, and a broad affect (Tr. 544). Plaintiff stated that she was applying for disability benefits because of her physical pain (Tr. 544). Dr. Schroeder concluded that Plaintiff did not have any restrictions in her activities of daily living related to her mental health functioning (Tr. 545). She stated that Plaintiff exhibited well-developed social skills (Tr. 545). She noted that Plaintiff appeared to have occasional problems with concentration and attention, but that she seemed to be able to understand, remember, and carry out short and simple instructions under ordinary supervision (Tr. 545). She diagnosed adjustment disorder with depressed

mood and assessed a global assessment of functioning (GAF) score of 75, with the highest score of 82 during the past year (Tr. 546).[8]

In April 2008, Plaintiff complained to Dr. Reece of vaginal itching for the past month, blurred vision for the past month, and cramps and aching in her legs (Tr. 458-59). Dr. Reece also noted that Plaintiff's diabetes was uncontrolled (Tr. 459). Dr. Reece discussed risk factor modifications with Plaintiff, and advised her to exercise regularly, lose weight, eat a low fat and low cholesterol diet, monitor and control her diabetes, and control her blood pressure (Tr. 459).

Plaintiff returned to Dr. Reece in June 2008 for help with her diabetes (Tr. 455). She told Dr. Reece that she had been diagnosed with diabetes 10 years earlier at a clinic (Tr. 455). She was not checking her blood sugars and her blood sugar was poorly controlled (Tr. 455). She was fairly compliant with her medication (Tr. 455). Dr. Reece stressed the importance of risk factor modifications (Tr. 456). Plaintiff stated that she could not afford her medication and was given samples (Tr. 456).

In September and October 2008, Jeffrey Brittan, M.D., treated Plaintiff 5 times for complaints of bronchitis (Tr. 493-97). In November 2008, she went to Dr. Brittan for a recheck of her bronchitis and complained of abdominal pain (Tr. 492). Her gallbladder was removed two days later (Tr. 465). She recovered well and 10 days

---

[8] A GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. revision 2000) (DSMIV- TR). A GAF of 71 to 80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors; no more than slight impairment in social, occupational, or school functioning. *See* DSM-IV-TR, 34. A GAF of 81 to 90 indicates absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns. *See* DSM-IV-TR, 34.

later was released to resume normal activities, including work (Tr. 465, 489, 510). Plaintiff told Dr. Brittan in January 2009 that although her pain never went away, she otherwise felt good (Tr. 488).

In April and June 2009, Dr. Brittan gave Plaintiff samples of medication because she was having a hard time keeping up with her medications for financial reasons (Tr. 485-86). Plaintiff returned in June 2009, complaining of high blood pressure and swelling in her feet and legs (Tr. 484). Dr. Brittan continued her medications and followed up with her two weeks later (Tr. 483-84).

At the end of June 2009, Plaintiff saw another physician in Dr. Brittan's office for diabetes education as her blood sugars had been elevated (Tr. 482). He talked with her about her food intake and told her to keep a food diary (Tr. 482). Plaintiff returned weekly during July 2009, bringing in her food diary (Tr. 479-81). Her blood sugars were reduced to 150 (Tr. 480). She lost five pounds (Tr. 481).

In December 2009, Dr. Brittan completed a letter for Plaintiff's application for disability (Tr. 536). He noted that she suffered from multiple medical problems, including diabetes with secondary complications of peripheral neuropathy, loss of vision, and some renal insufficiency (Tr. 536). He opined that the combination of all of these problems, most specifically the peripheral neuropathy from the diabetes, made it impossible for her to work (Tr. 536).

At her administrative hearing on December 4, 2009, Plaintiff testified that she had problems with diabetes, fibromyalgia, lupus, Raynaud's syndrome, scleroderma, sleep apnea, acid reflux, migraines, and problems with memory (Tr. 92). She weighed over 250 pounds (Tr. 86). She rated her pain at 3 to 5 on a 10-point scale in the morning, but stated that the pain worsened throughout the day (Tr. 99). She would have days that were worse than others, but she was always in pain, as none of her medications relieved her pain completely (Tr. 95, 99-100). She stated that a warm bath

helped, but she had to be careful with the heat because her lupus flared up and she could not use ice because then she had trouble with her Raynaud's disease (Tr. 95).

In describing her daily life, Plaintiff stated she lived with her husband in a house and did not have any children (Tr. 87). She could drive, but her husband did most of the driving (Tr. 87). She could care for her personal needs, although her husband occasionally helped her with her hair, and helped her with her socks and shoes every day (Tr. 87). Plaintiff testified that she performed some household chores, with her husband's help (Tr. 88). She would clean up around the house, taking breaks after 10 to 15 minutes of work (Tr. 88). She spent most of her day sitting or laying down and watched about 4 hours of television each day (Tr. 88-89, 101). She testified that she would visit friends and family (Tr. 89). She also worked for 8 hours per night, 2 nights per week at an assisted living facility (Tr. 90). Plaintiff testified that she did not go to the doctor frequently unless she was really sick, because she did not have money to pay her doctor's bill (Tr. 93). In describing her physical capabilities, Plaintiff stated that she could sit for 20 to 30 minutes, stand for 15 to 20 minutes, walk around the block, and lift 10 to 15 pounds (Tr. 96-97). Plaintiff stated she had problems picking up small objects from a table, turning a key, and opening a can of pop (Tr. 97-98).

Jose Chaparro, a vocational expert, testified in response to a hypothetical question posed by the ALJ, outlining Plaintiff's age, education, work experience, and work-related limitations (Tr. 106- 10). The hypothetical individual could lift 10 pounds occasionally and frequently, could sit or stand at will, and could occasionally stoop, crawl, and kneel (Tr. 107). Considering the exertional and non-exertional limitations described by the ALJ, the vocational expert testified that the hypothetical person could perform representative occupations of nut sorter, production worker, and call out operator (Tr. 108-09).

## II. DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.* Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n2 (8th Cir. 1995).

### A. Plaintiff's Credibility

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003). To analyze a claimant's subjective complaints, the ALJ considers the entire record including the medical records, third party and the claimant's statements, and factors such as: 1) the claimant's daily activities; 2) the duration, frequency and intensity of pain; 3) dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5) functional restrictions. *See* 20 C.F.R. § 404.1529; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Plaintiff argues that the ALJ made a conclusory statement of her credibility, contrary to the requirements of Social Security Rulings 96-7p and 96-8p.[9] However,

---

[9] Social Security Ruling 96-7p states in part: "[I]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the

-11-

analysis of the ALJ's decision as a whole indicates that the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's subjective complaints, including the inconsistency between her allegations and the objective medical evidence, her daily activities, her minimal and conservative treatment, and her work activity (Tr. 126-30). *See* 20 C.F.R. § 404.1529.

First, the ALJ noted that there were very few objective findings to support Plaintiff's complaints (Tr. 126-28). The absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the claimant's testimony and complaints. *See* 20 C.F.R. § 404.1529(c); *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010). Despite Plaintiff's complaints of pain, her August 2006 physical examination showed that she had a steady gait and normal pulses, strength, sensation, and range of motion (Tr. 532). In February 2007, when Plaintiff told Dr. Reece that she was "thinking about trying to get permanent disability" for her fibromyalgia, she was working 5 to 7 days per week and her physical examination was normal except for some tenderness in the epigastric area (Tr. 329). In August 2007, despite her complaints of pain, Plaintiff's physical examination was unremarkable; she had normal muscle strength and tone, no motor and sensory changes, and no remarkable neurological findings (Tr. 454).

---

regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *1 (Soc. Sec. Admin. July 2, 1996). Social Security Ruling 96-8p provides, among things, that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (Soc.Sec.Admin. July 2, 1996).

-12-

During her physical consultative examination in March 2008, Plaintiff moved slowly and appeared to be in discomfort but she had good range of motion of both upper and lower extremities (Tr. 419-22). Her pedal pulses were excellent (Tr. 422). She had no motor or sensory deficits (Tr. 422). Dr. Lamberty opined that more sedentary type work would appear to be within her grasp, provided that she frequently changed positions and continued on her medications (Tr. 423). Dr. Brittan's records do not reflect any severe or limiting physical findings (Tr. 479-88). Although the ALJ did not discredit Plaintiff solely based on the absence of objective findings to support her assertions, the lack of objective findings was an important consideration for him in evaluating Plaintiff's credibility.

The ALJ also considered that Plaintiff's treatment was conservative in nature (Tr. 126-27). Her office visits were for treatment for acute illnesses (Tr. 126-27, 321, 331, 407-08, 416, 453-54, 458-59, 492, 494-97) or medication refills (Tr. 126-27, 281, 455-56, 479-88). The Eighth Circuit has consistently held that allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment. *See, e.g., Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003)* ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [the plaintiff] would have sought regular medical treatment."). The ALJ properly considered that Plaintiff's minimal and conservative medical treatment diminished her credibility regarding her allegation that her impairments prevented her from performing all work.

Plaintiff testified that she did not visit the doctor often because she owes on her bill and has no way to pay it (Tr. 93). Although economic justifications for the lack of treatment can be relevant to a disability determination, Plaintiff offered no testimony or other evidence that she had been denied further treatment or access to prescription medicine on account of financial constraints. *See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994)* ("[T]he claimant offered no testimony or other evidence that she had been denied further treatment or access to prescription pain medicine on account of financial constraints."); *Goff v. Barnhart, 421 F.3d 785, 793*

(8th Cir. 2005) ("[T]here is no evidence [the claimant] was ever denied medical treatment due to financial reasons."). In fact, she was given samples of medication (Tr. 129, 456, 485-86) and received medication assistance from the Pfizer Connection to Care program (Tr. 498).

The ALJ determined that Plaintiff's depression was medically determinable, but not severe (Tr. 127). He included in his decision his rationale for reaching that conclusion (Tr. 127). *See* 20 C.F.R. § 404.1520a. In rating the degree of Plaintiff's functional limitations under the "paragraph B" criteria, the ALJ determined Plaintiff had no limitation in activities of daily living; no limitation in social functioning; mild limitation in concentration, persistence, or pace; and no episodes of decompensation that have been of extended duration (Tr. 127). The psychological consultative examiner opined that Plaintiff did not have any restrictions in her activities of daily living or social functioning, but had problems with focus and concentration (Tr. 127, 545). The ALJ's findings were supported by the state agency psychological consultant who also found that Plaintiff had only mild limitations in concentration, persistence, or pace (Tr. 437).

In evaluating her activities of daily living, the ALJ considered Plaintiff's testimony at the administrative hearing that she cared for most of her personal grooming, performed household chores with her husband's help, watched television, and worked part time (Tr. 87-90, 127). Activities that are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001). The ALJ also discussed Plaintiff's part-time work (Tr. 126-27). *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) (holding it was reasonable for the ALJ to note that the claimant's part time work was inconsistent with her claim of disabling pain).

The ALJ also considered that when Plaintiff had poor blood sugar control in June 2008, she was not checking her blood sugars (Tr. 129, 456). "A failure to follow a recommended course of treatment also weighs against a claimant's credibility."

-14-

*Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). Plaintiff was instructed to exercise regularly, lose weight, monitor and control her diabetes, control her blood pressure, and take aspirin daily (Tr. 129, 456, 459). When Plaintiff changed her medications and diligently kept her food diary, her blood sugars were significantly reduced (Tr. 129, 480). "An impairment which can be controlled by treatment or medication is not considered disabling." *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009).

The ALJ articulated the inconsistencies upon which he relied in discrediting Plaintiff's testimony regarding her subjective complaints (Tr. 128-30). Substantial evidence on the record as a whole supports the ALJ's credibility determination. *See Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").

### B. Medical Opinions

An ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). Dr. Brittan's opinion that "[t]he combination of all of [Plaintiff's] impairments makes it impossible for her to work" is not entitled to controlling weight, however, because it goes to the ultimate question of whether Plaintiff is disabled, which is an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); SSR 96-5p, 1996 WL 374183 (Soc. Sec. Admin. July 2, 1996); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

The ALJ recognized Dr. Brittan's opinion was conclusory and not entitled to controlling weight, but still evaluated the opinion as required by the regulations and

found it was not persuasive (Tr. 130). *See* SSR 96-5p, 1996 WL 374183, at *2 ("[A]djudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner.)" Medical source opinions which are not entitled to controlling weight are evaluated by considering all of the factors in 20 C.F.R. § 404.1527(d) (*e.g.*, nature and extent of medical source's relationship with claimant, supportability, consistency with other evidence, and specialization).

Dr. Brittan treated Plaintiff in the fall 2008 for bronchitis (Tr. 494-97). He rechecked her diabetes from April 2009 through July 2009 (Tr. 479-88). His medical records do not contain any objective findings to support a claim that Plaintiff could not work. There is one record of swelling in her feet and legs that Dr. Brittan treated with medication (Tr. 484). Other physical examinations show that Plaintiff had normal muscle strength and tone and normal gait (Tr. 422, 454, 532). Although Dr. Brittan stated that Plaintiff could not work primarily due to her peripheral neuropathy, there are no records that Plaintiff demonstrated any limitations from her neuropathy. Her examinations showed normal pedal pulses and sensation in all extremities (Tr. 422, 454, 532). Her gait and ability to walk were not affected (Tr. 408, 422, 532). Dr. Brittan's opinion that it was impossible for Plaintiff to work is inconsistent with the objective medical evidence of record.

None of Plaintiff's other physicians opined that she was disabled. Dr. Reece told Plaintiff that she would need to see a different physician to qualify for disability (Tr. 329). Dr. Lamberty opined that Plaintiff could perform sedentary work with frequent position changes (Tr. 423). The doctor who removed Plaintiff's gall bladder released her to resume normal activities, including work (Tr. 465, 489, 510). Rather than limiting her activity, Plaintiff's doctors encouraged her to move more and exercise (Tr. 454, 534). Dr. Blakely told Plaintiff that she would not feel better unless she participated in regular exercise (Tr. 534). Dr. Reece also told Plaintiff to exercise regularly as part of her risk factor modifications (Tr. 456, 459).

The ALJ found that although Dr. Brittan was Plaintiff's treating physician, the opinion of the consultative examiner was most consistent with the sparse medical evidence and was entitled to significant weight (Tr. 130). An ALJ is warranted in discrediting some of the treating physician's opinions which are inconsistent with, and contradicted by, other evidence in the record. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (treatment notes assessing claimant as "improved" and "fair" were inconsistent with treating physician's RFC form and claimant's claim of disability); *see also Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008) ("[The plaintiff's activities of daily living do not reflect the physical limitations found by [his treating physician]."). As Dr. Brittan's opinion was conclusory, cited no medical evidence, and was inconsistent with the medical evidence of record, the ALJ properly gave little weight to his opinion (Tr. 130). *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (ALJ properly discounted physician's opinion which was conclusory, consisted of three checklist forms, cited no medical evidence, and provided little to no elaboration).

Plaintiff argues that the ALJ had a duty to contact Dr. Brittan and have him complete the appropriate RFC criteria forms. This is not the law. The duty to "fully and fairly develop the record" concerning a claimant's limitations only exists where the professional opinions available are not sufficient to allow the ALJ to form an opinion. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005); *see also Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (holding that the ALJ does not need to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped). Here, the records were clear, legible, and complete, and used acceptable clinical and laboratory techniques. The ALJ found that medical evidence, including additional medical opinions on Plaintiff's ability to work, combined with the rest of the credible evidence of record, was sufficient to formulate Plaintiff's RFC (Tr. 128). I find no basis for overturning the ALJ's assessment.


## *III. CONCLUSION*

Accordingly, I conclude that the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g). Final judgment will be entered by separate document.

February 28, 2012.                    BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.